IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| STATE OF MISSOURI, *et al.*,<br><br>　　　　　　　　　　*Plaintiffs*,<br>　　v.<br>MERRICK GARLAND, in his official capacity as Attorney General of the United States, *et al.*,<br>　　　　　　　　　　*Defendants*. | Case No. 4:24-cv-01473<br><br>Hon. Sarah E. Pitlyk |

**OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER**

Defendants Merrick Garland, in his official capacity as the Attorney General of the United States; Kristen Clarke, in her official capacity as Assistant Attorney General for the Civil Rights Division; and the Department of Justice hereby oppose the Motion for Temporary Restraining Order ("TRO"), ECF No. 2. The State of Missouri filed the TRO motion to prevent the Department of Justice from entering polling sites to conducting monitoring during tomorrow's federal elections. The motion is based on Defendants' purported lack of authority to conduct such monitoring. But as explained in the attached declaration from John Buchko of the Civil Rights Division, U.S. Department of Justice, the planned monitoring is pursuant to a Settlement Agreement between the United States and the St. Louis Board of Election Commissioners under Title II of the Americans with Disabilities Act ("ADA"), which explicitly permits monitoring (including on Election Day) for compliance with the Agreement. The Settlement Agreement, executed in January 2021, was an exercise of Defendants' statutory authority under Title II of the ADA and the regulations promulgated thereunder. *See* 42 U.S.C. §§ 12131-12134; 28 C.F.R. Part 35. To the extent Missouri argues that state law prohibits federal officials' planned monitoring, that state law, as interpreted, stands as an obstacle to the enforcement of the federal law—here, the ADA—and is therefore conflict-preempted. For these

1

reasons, the State is unlikely to succeed on the merits, and as further discussed below, even if the Court finds it necessary to balance the equities, such balancing decidedly tips in favor of denying Missouri's TRO motion, given the strong federal and public interest in the enforcement of the ADA, and the lack of support for the speculation that the planned federal monitoring would cause confusion and disruption.

## ARGUMENT

### I.   Standard of Review

A motion for temporary restraining order "is an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and may issue only when the movant carries its burden of persuasion "by a clear showing," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *see also Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022) (the standards governing the issuance of a TRO are the same as those that govern a preliminary-injunction motion). The movant "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. Where, as here, the federal government is the defendant, the third and fourth factors merge into a consideration of the public interest. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[T]he burden of establishing the propriety of an injunction is on the movant." *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021). Here, Missouri fails to carry that burden.

### II.  Defendants Are Likely to Succeed on the Merits

Missouri's motion is premised on the State's assertion that Defendants are without authority to conduct the planned monitoring of polling sites during tomorrow's elections in St. Louis. That premise is wrong. As explained in the attached declaration of John Buchko, the

2

planned inspection will take place pursuant to the Settlement Agreement between the Department of Justice and the St. Louis Board of Election Commissioners ("Board"). *See* Exhibit C (Declaration of John Buchko), ¶ 4; Exhibit A (Settlement Agreement); Exhibit B (Extension of the Settlement Agreement). The Settlement Agreement, in turn, was an exercise of the Department of Justice's authority under Title II of the ADA and the regulations promulgated thereunder. Specifically, the Board is clearly a "public entity" within the meaning of the ADA, *see* 42 U.S.C. § 12131(1) (defining "public entity" to include a "department, agency, special purpose district, or other instrumentality of a State or States or local government"), and subject to the ADA's antidiscrimination provision in 42 U.S.C. § 12132. Title II of the ADA further directs the Attorney General to promulgate regulations to implement 42 U.S.C. § 12133, and the Attorney General has done so, *see* 28 C.F.R. Part 35 ("Nondiscrimination on the Basis of Disability in State and Local Government Services"); *see also* 28 C.F.R. § 35.172 (authorizing designated agencies to conduct investigation and compliance review of public entities to "ascertain whether there has been a failure to comply with the nondiscrimination requirements of this part" and "to attempt informal resolution of any matter being investigated").

As explained in the Settlement Agreement, pursuant to these authorities, the United States entered into the Settlement Agreement with the Board on January 12, 2021, due to "substantiated complaints alleging that in some instances (1) the Board's polling places contain architectural barriers that render the facilities inaccessible to voters with disabilities; (2) the Board fails to provide accessible curbside voting; (3) the Board fails to provide voters with disabilities the same amount of privacy and independence while voting as voters without disabilities; (4) the Board's designated accessible voting machines lack adequate maneuvering space and reach ranges for voters with disabilities; and (5) the Board failed to provide auxiliary

3

aids and services, including headphones, to ensure that the accessibility features of the designated accessible voting machines were functioning on Election Day." Settlement Agreement, ¶ 4; *see also* Department of Justice Press Release.[1] To permit St. Louis additional time to come into compliance, the agreement was extended on October 3, 2023, and will expire on July 11, 2025. Buchko Decl. ¶ 4; Extension of the Settlement Agreement. Part II of the Agreement sets forth the Board's obligations, *see* Settlement Agreement, ¶¶ 16-44, and paragraph ¶ 46 of the Agreement further provides that the "Board will cooperate fully with the United States' efforts to monitor compliance with this Agreement, including but not limited to providing the United States with timely access to polling places (including on Election Day) . . . ."

Pursuant to this Settlement Agreement, the Disability Rights Section of the Civil Rights Division has conducted election-day polling site accessibility monitoring on multiple occasions, including most recently during the April 2, 2024, local election. Buchko Decl. ¶ 7. It intends to do the same for tomorrow's elections. *Id.* ¶ 8. As explained in the Buchko declaration, the Department of Justice will not be monitoring St. Louis's compliance with any statute other than the ADA and only pursuant to the above-discussed Settlement Agreement for tomorrow's elections. *Id.* ¶ 9.

To the extent Missouri intends to collaterally attack the validity of the Settlement Agreement,[2] it has no likelihood of success. As explained above, the Board is subject to the

---

[1] *See* Justice Department Reaches Agreement with the Board of Election Commissioners for the City of St. Louis to Ensure Polling Place Accessibility for Voters with Disabilities, *available at* https://www.justice.gov/opa/pr/justice-department-reaches-agreement-board-election-commissioners-city-st-louis-ensure.

[2] Counsel for Defendants has shared the existence of the Settlement Agreement as well as the limited scope of the Department of Justice's planned monitoring with counsel for Missouri.

4

ADA and the United States had the statutory authority to enter into the Settlement Agreement with the Board pursuant to the ADA and the regulations promulgated thereunder. The relevant question, then, is whether the cited state law (Mo. Rev. Stat. § 115.409) nevertheless prohibits federal officials from the conducting the planned monitoring in St. Louis. The answer is clearly no even if Missouri's interpretation of state law is correct, because under the Supremacy Clause, federal law is "the supreme Law of the Land," preempting any contrary state or local laws. U.S. Const. art. VI, cl. 2; *Arizona v. United States*, 567 U.S. 387, 339 (2012). While Congress can explicitly preempt state law, it can also do so implicitly, *Arizona*, 567 U.S. at 399, such as when the "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* Here, as interpreted by Missouri, the state law presents an obstacle to the Department of Justice's enforcement of the antidiscrimination provision of the ADA because it prevents the Department of Justice from conducting the polling site monitoring on Election Day as contemplated by the Settlement Agreement, which, as explained above, is itself an exercise of the Department's authority under the ADA.

For these reasons, the State is not likely to succeed on the merits of this case, and the TRO motion should be denied for that reason alone. "Success on the merits has been referred to as the most important of the four factors." *Roudachevski v. All-Am. Care Centers, Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (citing *Kai v. Ross*, 336 F.3d 650, 653 (8th Cir. 2003)).

### III.   The Balance of Harms Tips Against Issuance of a TRO

The balance of harms also decidedly tips against the issuance of the requested TRO. The federal government has a strong interest in the enforcement of federal law, *cf. United States v. Missouri*, 114 F.4th 980, 984 (8th Cir. 2024) (so noting in an analysis of standing), including the Americans with Disabilities Act. With respect to St. Louis, that interest is far from abstract—as

5

the Settlement Agreement explained, 39 of the city's polling sites used in the April 2019 election "contained at least one or more architectural barriers, such as stairs, excessively sloped parking areas, narrow doorways, steep ramps, protruding objects, and inaccessible doorknobs, that rendered the facilities inaccessible to voters with disabilities." Settlement Agreement ¶ 3.[3]  This is in addition to the "substantiated complaints" the Department of Justice identified in the Agreement regarding other "architectural barriers," curbside voting inaccessible to voters with disabilities, insufficient privacy for voters with disabilities, an absence of "adequate maneuvering space and reach ranges for voters with disabilities," and a "fail[ure] to provide auxiliary aids and services, including headphones, to ensure that the accessibility features of the designated accessible voting machines were functioning on Election Day." *Id.* ¶ 4.  The Department now seeks to ensure that St. Louis voters enjoy the protections of the ADA during a federal election, as explicitly contemplated in the Settlement Agreement, *id.* ¶ 46 ("Reviewing Compliance:  The United States may review compliance with this Agreement at any time.  The Board will cooperate fully with the United States' efforts to monitor compliance with this Agreement, including but not limited to providing the United States with timely access to polling places (including on Election Day)[.]"), thereby advancing a congressionally sanctioned public interest.

      Against this significant federal and public interest, Missouri offers a blanket statement that in suits by States against the federal government, "often 'the harms and equities will be very weighty on both sides,' meaning resolution of a preliminary injunction 'ultimately turns on the merits.'" Pls.' Br. at 9 (quoting *Ohio v. EPA*, 144 S. Ct. 2040, 2052-53 (2024)).  Defendants

---

[3] Although the Board of Election Commissioners for the City of St. Louis denies these allegations, Settlement Agreement ¶ 5, it nonetheless entered an agreement with the Department to remediate them, *see generally id.*

6

agree, in that the likelihood of success on merits factor is the most significant factor when assessing whether to grant the requested extraordinary relief, and as already discussed above, the State has no likelihood of success. But even if the State were correct on the merits, the Supreme Court has reaffirmed time and again that an injunction does not follow as a matter of course when a movant has established likelihood of success on the merits. *See, e.g.*, *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-12 (1982). *Ohio v. EPA* did nothing to displace that longstanding principle of equity jurisprudence—rather, it merely observed that *often* States and the federal government will advance "weighty" interests in State-federal suits. 144 S. Ct. at 2052-53.

Moreover, the State has not substantiated its allegedly countervailing interests here. It first offers that "Missouri already has robust election laws to protect voters, and DOJ has identified no specific voting problems within the City of St. Louis." Pls.' Br. at 8 (citing Mo. Rev. Stat. ch. 116). Of course, the State made that assertion apparently without knowledge of the publicized Settlement Agreement between the United States and the Board to remediate potential ADA violations. St. Louis's shortcomings that gave rise to the Settlement Agreement clearly justify the planned monitoring. Settlement Agreement ¶¶ 3-4. Although the State argues that "confusion and disruption" could result from the Department's personnel arriving on-site to inspect polling places, Pls.' Br. at 9, they cite so support for such proposition and in fact, the assertion is belied by the Department's prior monitoring of elections since the Settlement Agreement was executed in January 2021. It is speculative that the arrival of a few Department personnel to monitor ADA compliance will confuse or disrupt elections workers. *See* Buchko Decl. ¶ 8 (noting that two individuals from the Disability Rights Section have arrived in St. Louis to conduct the planned monitoring). Indeed, as the Buchko Declaration has also

7

explained, the Board was notified in October 2024 of the planned monitoring, and since then, has cooperated and coordinated with the Department about the monitoring. *Id.*  One would expect the Board to raise concerns about any such confusion or disruption.  In any event, any potential disruption pales in comparison to Defendants' interest in ensuring that the Board upholds its obligations under the ADA and the Settlement Agreement.  More importantly, while Missouri argues that it has an interest in ensuring that its state law concerning access to polling sites are not violated, *see* Pls.' Br. at 9, there is a stronger federal and public interest in ensuring that state law does not stand as an obstacle to the enforcement of federal law.  *See Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1059-60 (9th Cir. 2009) (including in a public-interest analysis the "Constitution's declaration that federal law is to be supreme").

      Finally, Missouri's motion fails for an additional, independent reason:  the significant delay in seeking this purportedly time-sensitive relief.  "[D]elay alone may justify the denial of a preliminary injunction when the delay is inexplainable in light of a plaintiff's knowledge of the conduct of the defendant."  *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 894 (8th Cir. 2013).  Here, the State's delay in seeking emergency relief until the eve of a federal election is inexplicable considering the fact, as discussed above, that the Settlement Agreement was signed—and publicized, through a press release available on the Department's website—in January 2021, almost four years ago.  Given its own role in enforcing state elections law—*see* Pls.' Br. at 9 ("Missouri shares the general interest in protecting voters and polling locations")—the State should have been aware of the Settlement Agreement during the ensuing four-year period.  Under these circumstances, the State's delay itself is a sufficient basis on which to deny its motion.  *See Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023) (affirming denial of preliminary injunction solely because of delay).

8

**CONCLUSION**

For the foregoing reasons, this Court should deny Missouri's TRO motion.

Dated:  November 4, 2024                                    Respectfully submitted,

                                                                                    BRIAN M. BOYNTON
                                                                                    Principal Deputy Assistant Attorney General

                                                                                    ALEXANDER K. HAAS
                                                                                    Director, Federal Programs Branch

                                                                                    */s/ Simon G. Jerome*
                                                                                    JEAN LIN
                                                                                      Special Litigation Counsel
                                                                                    SIMON G. JEROME
                                                                                      D.C. Bar No. 1779245
                                                                                      Trial Attorney
                                                                                    United States Department of Justice
                                                                                    Civil Division, Federal Programs Branch
                                                                                    1100 L Street, N.W.
                                                                                    Washington, D.C. 20005
                                                                                    Tel.:  (202) 514-2705
                                                                                    Email:  simon.g.jerome@usdoj.gov

                                                                                    *Counsel for Defendants*